Rockwell *v.* Kaplan, Appellant.

Argued June 1, 1961. Before JONES, C. J., BELL, JONES, BOK and EAGEN, JJ.

*Philip H. Strubing,* with him *K. Robert Conrad,* and *Pepper, Hamilton & Scheetz,* for appellant.

*Wilfred R. Lorry,* with him *Abraham E. Freedman, Charles Sovel,* and *Freedman, Landy & Lorry,* for appellee.

**576**

The facts need not be repeated here, since they have been fully set forth in Mr. Justice Benjamin R. Jones's opinion in *Rockwell v. Stone*, 404 Pa. 561 (1961), 173 A. 2d 48. Suffice it to say that plaintiff recovered a verdict against both doctors, who have separately appealed. Dr. Kaplan, the subject of this opinion, asks judgment n.o.v. or, if he may not have it, a new trial. Both requests were refused below and this appeal is from the ensuing judgment.

Since we are considering a motion for judgment n.o.v., the evidence must be seen in the light most favorable to the plaintiff, who has the verdict: *Coradi v. Sterling Oil Co.,* 378 Pa. 68 (1954), 105 A. 2d 98; *Beatty v. Hoff,* 382 Pa. 173 (1955), 114 A. 2d 173.

Dr. Kaplan's liability rests on two piers, either one of which will support it: his own negligence and his responsibility as principal for Dr. Stone's negligence, which has been established by the companion case of *Rockwell v. Stone,* supra.

The following facts appear in the record: Dr. Kaplan said that he was "the boss of the surgical end of it" and that the plaintiff was his patient; he chose the hospital and arranged the plaintiff's admission; he chose to use a minor elective surgical procedure to remove the bursa from plaintiff's right arm, which procedure could be postponed or done at the patient's convenience; he overruled his patient, who wanted local anesthesia, and ordered a general one; if he did not choose Dr. Stone, who was the chief of the hospital's anesthesiology department, he chose Dr. Stone's hospital and was satisfied with him and with his choice of sodium pentothal as the induction agent and a gas for the general anesthesia; that when an alkali like sodium pentothal is injected in an artery the artery contracts by spasm and if the blood is shut off entirely by spasm it stagnates, a condition known as stasis; that clotting

occurs about twenty minutes after stasis; that if stasis is corrected before clotting there will be no complications; that plaintiff was presented to Dr. Kaplan for surgery fifteen minutes after the injection; that the injection in plaintiff's left arm missed the vein and went in or around an artery; that although Dr. Stone chose not to tell Dr. Kaplan of the "catastrophe" that had occurred at induction with the sodium pentothal, which is a very dangerous drug, Dr. Kaplan could and did see that the plaintiff's left arm was extended on the intravenous board when the patient entered the operating room; that he assumed that when the patient was presented to him in the operating room he was ready for surgery; that he made no inquiry about the plaintiff's reaction to the anesthesia, although Dr. Stone and his assistants did the unusual thing of remaining in the operating room and watching the left arm; that the arm visibly deteriorated during the operation and the pulse vanished while in the recovery room afterwards; and that he left the operating room and the hospital without seeing the plaintiff in the **recovery** room and until after he was summoned back to the hospital by the plaintiff's emergency condition.

Hence the basic question of fact was whether Dr. Kaplan should have seen the condition of the arm or should have asked about it and having found out should have refused to operate until it had been taken care of. In leaving such matters generally to the jury on the ground of negligence, the trial judge gave Dr. Kaplan more than he deserved when he said: "There is no testimony in the record that I can recall whereby such a standard of care is required under those circumstances of a surgeon in attendance. Therefore, if you find that there has been no violation of his duty in that regard there would be no basis for a finding of responsibility on the part of Doctor Kaplan on the first ground alone, namely negligence."

There is no dispute that the misuse of sodium pento-thal caused the condition of plaintiff's arm, which in turn caused its amputation. The jury needed no expert testimony of what Dr. Kaplan's duty was: it was, so far as they were concerned, to do something quickly for a dangerous condition which the evidence shows was visible and urgent. Something specific was done, though too late, and the jury had the advantage of knowing what it was. But it was not necessary that they understand the remedy, only that there was something in Materia Medica that was not done but that needed doing and doing with dispatch. There was no conflict of testimony over this.

Plaintiff's personal negligence was therefore properly left to the jury under the full range of the circumstances. Certainly summary judgment should be given only in clear cases: *Pantuso v. Pittsburgh Motor Coach Co.*, 360 Pa. 464 (1948), 62 A. 2d 56.

As for Dr. Kaplan's responsibility for Dr. Stone's negligence, Dr. Stone testified that a surgeon could use the hospital's anesthesiologist or bring in his own. Dr. Kaplan testified that he was "the boss of the surgical end of it", and that "as long as Dr. Stone had anything to do with the anesthesia I was perfectly satisfied." He chose the hospital in which Dr. Stone worked and chose a general rather than a local anesthetic. Dr. Stone testified that Dr. Kaplan had the authority to ask or tell him what sort of anesthesia he wanted, although it was not the practice at the Graduate Hospital to do so. Dr. Kaplan said that if it was best for his patient's safety he could discontinue the operation and tell the anesthesiologist to stop giving anesthetic, particularly in minor elective surgical procedure. His words were, on the latter point: "Q. Suppose you felt that anesthesia should stop and the anesthetist felt that it should continue, and you felt that continuation would create a critical condition for your patient? A. I would stop

immediately, regardless of what he had to say, if I felt strongly that this should stop, I would stop it. Q. And you would tell the anesthetist to stop it, wouldn't you? A. I would. Q. And he would stop, wouldn't he? A. I think he would have to."

The foregoing is very different from the independent contractor-like language of Dr. Kaplan's brief. We think it points clearly to the language concerning borrowed employes in *Mature v. Angelo,* 373 Pa. 593 (1953), 97 A. 2d 59: "A servant is the employe of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not."

And to *McConnell v. Williams,* 361 Pa. 355 (1949), 65 A. 2d 243, where, in addition to the now famous analogy of the ship captain, Mr. Justice STERN (later Chief Justice) said: "But for the period of the operation itself the situation is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations."

Nor was there a conflict of evidence on the question of right of control. Dr. Kaplan and Dr. Stone did not disagree in their testimony as it has been condensed above, nor can there be doubt based on common sense that Dr. Stone acted on Dr. Kaplan's business; he had to or the surgeon could not operate. The undisputed evidence clearly shores up the instruction of the trial judge: "And in the eyes of the law, in this case, Dr. Stone was the agent for a step in the operative procedure, the anesthesia step. He was the agent of Dr. Kaplan."

It is clear, under *Yorston v. Pennell,* 397 Pa. 28 (1959), 153 A. 2d 255, that doctors are subject to the law of agency and may at the same time be agent both

of another physician and of a hospital, even though the employment is not joint.

This establishes the theory of respondeat superior and also answers the heart of defendant's motion for a new trial. We have carefully read the charge and see no error in it when looked at in the round. We have also examined defendant's makeweight arguments and find them without merit.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

Although alleged, the case at bar in my opinion presents no evidence of any *direct* negligence on the part of Dr. Kaplan and Dr. Kaplan's liability, if any, must be premised on the theory of vicarious liability. Stated otherwise, is Dr. Kaplan liable for malpractice under the doctrine of respondeat superior for an act of negligence which occurred, outside his presence and without his knowledge, during the preoperative procedure involved in the administration of an anesthesia?

Certain factual circumstances must be noted. Dr. Kaplan neither requested nor exercised any choice in the selection of any particular anesthesiologist to administer the anesthesia. Although Dr. Kaplan, as any other surgeon, was at liberty to select any anesthesiologist he so desired, he simply indicated to Dr. Stone, the Chief of the Department of Anesthesiology, that he wanted a general anesthesia administered and relied upon Dr. Stone's professional competency for selection of the type of anesthesia and the person or persons to administer it. Such service was provided by the hospital and the compensation for such service would be billed by the hospital to the patient and would be paid by the latter directly to the hospital. The personnel

of the Department were employed by, paid by and under the general control and direction of the hospital which had the sole power to dismiss such personnel.

When the incident occurred, as previously stated, Dr. Kaplan was not present nor was his presence required at that time and, while the injection and ensuing incident took place at approximately 9:45 a.m., Dr. Kaplan was unaware of it until approximately noon.

In his attempt to fasten liability on Dr. Kaplan, Rockwell relies on *McConnell v. Williams,* 361 Pa. 355, 65 A. 2d 243 and *Yorston v. Pennell,* 397 Pa. 28, 153 A. 2d 255. Both cases are clearly inapposite. In *McConnell,* supra, a surgeon was held liable for the negligent act of an intern who at the surgeon's request and direction assisted at an operation and, while in the operating room, negligently performed a specific act which caused injury. In *McConnell,* supra, the controlling features were that the surgeon had requested the particular intern to assist him and the intern was then *in the operating room* under the direction and control of the surgeon. *Yorston* presented a situation where a resident surgeon sought the advice of the chief surgeon for the preoperative, surgical and postoperative treatment of a patient and the chief surgeon, without knowledge of the patient's allergic background, prescribed a course of postoperative care which required the use of penicillin to which the patient had an allergy; after administration of this antibiotic, the patient suffered a very severe physical reaction for which the surgeon was held liable. *Yorston* is the only case in which this Court has held a surgeon liable for preoperative negligence on the part of a general employee of a hospital and the Court did so because, under the particular factual situation therein presented, it considered the negligent actor a subagent of the surgeon as well as an employee of the hospital.

In the case at bar, Dr. Kaplan neither prescribed nor was he advised of the use of sodium pentothal; he did not administer it, was not present when it was administered and, in fact, did not know of it until hours later. Moreover, he exercised no direction, control or authority over Drs. Stone and Jiminez, or Molnar, while in the induction room and he did not request any of them to administer this drug. Dr. Kaplan was simply using the hospital facilities and its personnel, a service for which Rockwell would be billed directly.

The sodium pentothal was administered, outside of Dr. Kaplan's presence, in the induction room over which, to employ the language of *McConnell,* he was not the "captain of the ship"; over the personnel in that room—all hospital regularly employed persons— at that time *only* Dr. Stone was in command.

Rockwell urges that Dr. Kaplan was directly negligent in certain respects: (1) in that he failed to notice the blanched and pallid color of Rockwell's arm; (2) in that he failed to look at the anesthesia record while Rockwell was in the operating room; (3) in that the presence of Rockwell's left arm extended on and tied with gauze to an intravenous board should have placed Dr. Kaplan on notice of a mishap; (4) in that the combined and continuous presence of Dr. Stone, Dr. Jiminez and Molnar throughout the operation should have placed Dr. Kaplan on notice that a mishap or something untoward had taken place. Such arguments find no support in fact.

First, assuming that Rockwell's left arm was still pallid and blanched when he was in the operating room, Dr. Kaplan's failure to notice and observe such condition cannot be said to be negligence since Dr. Kaplan's attention necessarily was directed to Rockwell's right arm and there is no evidence of record to show that Dr. Kaplan during the operating process was in a position to see and observe Rockwell's left arm. Second,

the failure of Dr. Kaplan to examine the anesthesia record did not constitute negligence. Once scrubbed and rendered sterile for an operation, a surgeon's movements must necessarily be limited and to require that he examine an unsterile anesthesia record would be foolhardy. Third, the fact that Rockwell's left arm was tied with gauze to an intravenous board brought no notice of any mishap to Dr. Kaplan; the placement of the arm in such manner in the event that intravenous injections during the operative process became necessary is certainly neither unusual or extraordinary. Lastly, the combined presence of Dr. Stone, Dr. Jiminez and Molnar during the entire course of the surgery in itself was not of such probative value as to put Dr. Kaplan on notice of the occurrence of any mishap or accident. Dr. Kaplan might well have assumed that Dr. Stone was present with two of his students in furtherance of their training. Either standing alone or collectively, none of the above enumerated situations were of sufficient character to raise a red flag and put Dr. Kaplan upon notice that any mishap had occurred during the administration of the anesthesia.

The surgery performed by Dr. Kaplan on November 11, 1955 was successful and entirely free of any negligent conduct on his part. There is not a scintilla of evidence of any direct negligence on Dr. Kaplan's part sufficient to subject him to liability. On the other hand, neither Dr. Stone, nor Dr. Jiminez, nor Molnar were acting in an agency capacity for Dr. Kaplan at the time of the injection of the sodium pentothal. Under such circumstances, in my opinion, Dr. Kaplan could not be held liable upon any theory of respondeat superior and the judgment as to Dr. Kaplan should be reversed and judgment n.o.v. entered in his favor.

Mr. Justice Bell joins in this dissenting opinion.