Tonsic et vir, Appellants, *v.* Wagner.

Argued November 11, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and CERCONE, JJ. (SPAULDING, J., absent).

*Daniel M. Berger,* with him *Berger and Kapetan,* for appellants.

*Wilbur McCoy Otto,* with him *Elmer Beatty, Jr.,* and *Dickie, McCamey & Chilcote,* for appellee.

OPINION PER CURIAM, March 24, 1972:
Order affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:

This is an appeal from the Order of the lower court denying appellants' motion for new trial following a jury verdict in favor of appellee-defendant, Pittsburgh Hospital Association. The jury found verdicts in favor of appellants in sums totaling $37,000 against a second defendant, Dr. J. Huber Wagner, who was appellant's independently selected physician.

The jury verdicts followed a trial in which appellants claimed that both the Pittsburgh Hospital and Dr. Wagner were liable for damages resulting from the failure to remove a Kelly clamp from appellant wife's abdomen at the conclusion of a colectomy operation. Wife-appellant had been admitted to appellee hospital for the performance of the surgery. A part of the hospital's charge for services was for the use of the operating room. The operation was performed by Dr. Wagner who was assisted by nurses and an intern, who were employees of appellee hospital, and by another surgeon, Dr. Weitzel, Dr. Wagner's associate.

In the course of the operation a number of instruments were used. These instruments, including the Kelly clamp, were the property of the hospital. The instruments were handed to Dr. Wagner by the scrub

nurse who stood by his side and were then returned by the doctor to this nurse. Neither the scrub nurse, nor the circulating nurse, nor the intern, nor the hospital itself counted the instruments or in any other way kept track of the instruments to determine if any had been allowed to remain in appellant's abdomen. Neither of the nurses nor the intern called Dr. Wagner's attention to the fact that a clamp was still in appellant's abdomen, nor did any of them take any action to remove the clamp.

At the conclusion of the testimony the trial judge, despite appellants' counsel's specific request, refused to permit the jury to determine whether appellee-hospital was vicariously liable for the negligence of its nurses and intern in failing to remove the clamp or cause it to be removed prior to the incision being closed with sutures. Rather the Court held that the doctor, as "captain of the ship", had exclusive control over the persons in the operating room and was therefore solely liable for any negligence committed there; and that the hospital could only be liable for negligence in failing to have required an instrument count as an institutional procedure.[1]

---

[1] Specifically, the Court charged the jury that:

"Now the law has been established that when a surgical operation is being performed in a hospital by a private surgeon, that is one who is not an employee of the hospital itself, and the hospital furnishes, as well as its equipment, certain of its employees for his assistance in performing the operation, those servants, such as nurses, interns, and the like, become for the time being, for the duration of the operation, the servants of the surgeon in charge subject to his control as to any acts relating to the operation. And he is responsible and legally liable for any wrongful acts or negligent acts that they perform to the exclusion of the hospital, although the hospital is in general the employer of the nurses or the interns . . .

"Now, these persons in the operating room, with the exception of Dr. Wagner himself, were completely under the control of Dr.

Following the Court's charge the jury specifically found that appellee was not negligent in failing to have an instrument count and its verdict was against Dr. Wagner alone. Appellant's motion for a new trial as to appellee-hospital was then filed.

In its opinion, the lower court stated that its charge concerning the liability of the hospital was in strict compliance with the doctrine that in an operating room, the surgeon in charge is the "captain of the ship" and that " '[t]he Supreme Court of Pennsylvania has never held that there can be two captains of the ship simultaneously'." Quoting from *Mazer v. Lipschutz*, 327 F. 2d 42, 52 (3rd Cir. 1964). Further, the lower court added that ". . . could different inferences be fairly drawn from the evidence as to who was the controlling

---

Wagner, the surgeon in charge. That includes his associate, Dr. Weitzel. As such, they were subject to the orders of Dr. Wagner and he was responsible for their acts during the operation and liable for any misconduct on their part for which he might be liable as well as they themselves, of course. As one of our Appellate Court Justices aptly put it, 'The surgeon in charge of an operation is the Captain of the Ship.' He's the boss and he is responsible and legally liable for the conduct of all on board."

". . . [H]e is responsible for the negligence of any other person in the operating room during the operation because he is the 'Captain of the Ship'. . .

"All right. The case of the Hospital as defendant with respect to standard of due care is different from that of the surgeon. The Hospital had only the obligation which every ordinary person has to use to see to it that the plaintiff did not leave with the clamp in her body. Now, inasmuch as we have eliminated from the Hospital the conduct of the attendants, the nurses, the intern, Dr. Weitzel and Dr. Wagner and the like, what is there left for which the Hospital in the exercise of ordinary care could be held negligent? In my opinion—and I have to instruct you accordingly—the only duty of the Hospital in this particular instance would be to use the care of an ordinary reasonably prudent person to provide guide lines for the conduct of operations of this character in its operating facility, and whether it did or did not do that is for you to determine in passing upon the question of negligence of the Hospital."

master of the borrowed employes at the time of the commission of the negligent act?

"Let us look at the act itself. What was it? It was the insertion, use, and abandoning in the abdomen of the patient of a Kelly clamp. Was that a routine act of hospital employes, as to which their superiors on the hospital staff had control or under any view of the facts could have control? Was it for the anesthetist to look up from her instruments and check to see that the doctor removed all of the clamps? Was it the responsibility of the circulating nurse, whose duty it was to run errands for the doctor, or of the scrub nurse?

"In our opinion any answer other than that it was the doctor's sole responsibility appears to be ludicrous. The act was a medical act, which he, a surgeon, and he alone could perform. Why then should the jury be asked or even permitted to determine whether his act in leaving the clamp in the patient's abdomen was one for which the hospital, as the party in control of that act, was responsible?"

The lower court's charge to the jury was therefore predicated on the court's belief that since the surgeon in an operating room has been designated by our case law as the "captain of the ship", other parties, including the hospital, could not be vicariously liable for the negligent acts of its employees performed in the operating room. This view, however, is not supported either by the case law or by the reasoning upon which the "captain of the ship" doctrine was predicated.

In *Thomas v. Hutchinson*, 442 Pa. 118, 275 A. 2d 23 (1971), the Supreme Court held that an operating surgeon who left the operating room prior to the closing of an incision did not necessarily have a principal-agent relationship with the intern and resident, self described as his "assistants", who closed the incision while leaving a sponge in the abdominal cavity. Further,

the Court held that the same result "would follow if the 'captain of the ship' doctrine may properly be invoked." Thereupon the Court reviewed the "captain of the ship" doctrine as first set forth in *McConnell v. Williams,* 361 Pa. 355, 65 A. 2d 243 (1949), and followed in *Benedict v. Bondi,* 384 Pa. 574, 122 A. 2d 209 (1956); *Yorston v. Pennell,* 397 Pa. 28, 153 A. 2d 255 (1959); *Rockwell v. Stone,* 404 Pa. 561, 173 A. 2d 48 (1961); *Rockwell v. Kaplan,* 404 Pa. 574, 173 A. 2d 54 (1961); and *Collins v. Hand,* 431 Pa. 378, 246 A. 2d 398 (1968).

From this review it was apparent to the Court in *Thomas* that the "captain of the ship" doctrine, when first enunciated, was a counterpart to the doctrine that hospitals enjoyed charitable immunity.[2] Therefore, by the creation of a "captain of the ship" doctrine, the courts avoided the spectacle of a person injured negligently in an operating room without any recourse against a solvent party in interest.

This desire to avoid the charitable immunity doctrine was apparently the underlying factor in *Rockwell v. Stone,* supra, and *Rockwell v. Kaplan,* supra, where the Court affirmed jury verdicts against both the surgeon and the chief anesthesiologist of the hospital for the negligence of the chief anesthesiologist and his assistants in not reporting or medically responding to an unusual occurrence during the injection of sodium pentothal. In both of these companion cases, it was clear that the surgeon as a practical matter did not direct

---

[2] Charitable immunity was, however, discarded in *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A. 2d 193 (1965). As noted in *Thomas,* McCONNELL stated that " 'if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations'." 442 Pa. at 126, 275 A. 2d at 27, quoting from *McConnell v. Williams,* supra.

or control the actions of the anesthesiologist. Indeed, it is well known that the surgeon is guided by the more expert anesthesiologist in matters of anesthesiology. Nonetheless, the Court in finding against the surgeon, adopted the language of *Mature v. Angelo,* 373 Pa. 593, 97 A. 2d 59 (1953), to the effect that " 'A servant is the employe of the person who has the *right* of controlling the manner of his perfomance of the work, irrespective of whether he actually exercises that control or not.' " 404 Pa. at 579, 173 A. 2d at 56. The Court then concluded that the surgeon should be held liable, not as a matter of fault on his part, but as was stated originally in *McConnell v. Williams,* supra, because " '[b]ut for the period of the operation itself the situation is entirely different, and *if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations'."* 404 Pa. at 579, 173 A. 2d at 56. (Emphasis added.)

Thus, it is quite apparent that the basis of the "captain of the ship" doctrine was to extend the possibilities of recovery for victims of negligence in the operating room. The doctrine was not intended, however, to limit liability to that of the operating surgeon and excuse others, including the hospital, from vicarious liability.

This latter issue did not, however, have opportunity to arise in the case law to this date, because it was only in 1965 that charitable immunity was overturned by *Flagiello v. Pennsylvania Hospital,* supra, and a basis provided for escaping from the restrictions on suing a hospital. Now that hospitals no longer enjoy charitable immunity, it is accordingly proper to inquire whether as a matter of the law, they may be held vicariously

liable for the negligence of their employees in the operating room.

Such vicarious liability may be grounded upon two distinct bases. First, conventional and basic principles of respondeat superior are apposite and, therefore, it should be determined whether the hospital and the operating surgeon may be jointly liable for the negligence of a hospital employee working under the ostensible direction of the surgeon in the operating room.

Second, even if no employee of the hospital is so negligent as to make the hospital liable, it must further be determined whether the hospital itself was negligent in its devising of rules and regulations which govern the standard procedures followed in the operating room.

Each ground will be examined separately.

## I

The principles pertaining to the hospital being jointly and severally liable with the operating surgeon for the negligent acts of hospital employees purportedly working under the direction and control of the surgeon are set forth in the Restatement of Agency, 2nd §§226 and 227 and the Comments thereto, which authority was recognized and adopted by our Supreme Court in *McConnell v. Williams, supra.*

Section 226 of the Restatement provides that "[a] person may be the servant of two masters not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." The official Comment to this section of the Restatement explains the meaning of the above language: "[a] single act may be done to effect the purposes of two independent employers. Since, however, the relation of master and servant is dependent upon the right of the master to control the conduct of the servant in the performance of the service, giving ser-

vice to two masters at the same time normally involves a breach of duty by the servant to one or both of them. A person, however, may cause both employers to be responsible for an act which is a breach of duty to one or both of them. He may be the servant of two masters, not joint employers as to the same act, if the act is within the scope of his employment for both; he cannot be a servant of two masters in doing an act as to which an intent to serve one necessarily excludes an intent to serve the other."

This comment makes clear that a servant serving the interests of two distinct masters may cause both employers to be responsible for a negligent act even though it was recognized as between the two employers that one had a priority of control over the servant. For instance, were the two employers to give two separate directions to a servant employed by both of them to serve a common goal, it would seem that the servant would opt to follow the direction of one of the masters to the exclusion and in defiance of the orders of the second master. This does not mean, however, that the control by the second master (or the community of interest as between the two employers) is not sufficient to make both employers responsible for the torts of the employee committed in the scope of his common employment.

Specifically, in the language of *Yorston v. Pennell,* supra, operating room personnel employed by the hospital remain general employees of the hospital during the operation and the agent of the surgeon for specific duties. Thus, "[p]hysicians and surgeons, like other persons, are subject to the law of agency and a physician *may be at the same time the agent both of another physician and of a hospital even though the employment is not joint."* 397 Pa. at 39, 153 A. 2d at 259. (Emphasis added.) See also *Rockwell v. Kaplan,* 404

Pa. at 579-580, 173 A. 2d at 57. The hospital and the surgeon then could become joint tortfeasors.

This concept is distinct from that stated in *McGrath v. E. G. Budd Manufacturing Company*, 348 Pa. 619, 36 A. 2d 303 (1944). In *McGrath*, the court was faced with the question of whether the negligence of a welder could be imputed to his employer, where the employer had loaned the welder to an independent contractor doing construction work for the employer. The Court held, as a matter of law, that the welder was acting solely as the agent of the independent contractor at the time that the negligence took place. Insofar as the employer was without power to command or direct the acts of the welder during such time, he was held not to be liable.

*McConnell v. Williams*, supra, however, makes clear that "[a] person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other: Rest. Agency, §226. Such is the case where an employee is transferred to carry on work which is of mutual interest to both of two employers and to effect their common purpose." 361 Pa. at 360, 65 A. 2d at 245. In such circumstances both masters become jointly and severally liable for the torts of the common agent, notwithstanding that in a showdown only one of the two masters would have real control. *Kissell v. Motor Age Transit Lines, Inc.*, 357 Pa. 204, 209, 53 A. 2d 593, 596 (1947); and *Siidekum, Administrator v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 414, 45 A. 2d 59, 62 (1946).

The trial judge in the instant case, however, did not let the jury pass on whether the hospital employees were agents of both the surgeon and the hospital. Instead he simply charged in accordance with *McGrath* that "[n]ow the law has been established that when a

surgical operation is being performed in a hospital by a private surgeon, that is one who is not an employee of the hospital itself, and the hospital furnishes, as well as its equipment, certain of its employees for his assistance in peforming the operation, those servants, such as nurses, interns and the like, become for the time being, for the duration of the operation, the servants of the surgeon in charge subject to his control as to any acts relating to the operation. And he is responsible and legally liable for any wrongful acts or negligent acts that they perform *to the exclusion of the hospital,* although the hospital is in general the employer of the nurses or the interns".

The basis for this charge, which completely ignored the joint liability doctrine set forth in Section 226 of the Restatement of Agency, was attributed by the trial court to the "captain of the ship" doctrine as first enunciated in *McConnell.* The trial court obviously believed that *McConnell* negated the effect of Section 226 of the Restatement in an operating room because *McConnell* required that the surgeon be the "captain of the ship". Theoretically, in the view of the trial court, the surgeon had ultimate control of the conduct of the interns and other hospital employees in the operating room. Such supremacy of control, however, of one master over another with respect to a common servant always and necessarily exists. Section 226, which the trial court recognized as a "correct statement of the law", does not make joint liability dependent upon the impossible goal of equal control. Instead, liability is to be predicated on the joint interest of the two masters.

Accordingly, the jury should have been charged that the hospital and the surgeon may have been jointly and severally liable for the negligence of any of the interns and other hospital personnel in the operating room, if the jury believed that one or more of these persons

were personally negligent with respect to the leaving of the Kelly clamp inside the abdomen of the plaintiff.

## II

If no employee of the hospital was negligent in such a manner as to make the hospital vicariously liable, there is still a question of whether the hospital itself is liable for negligence in its devising of rules and regulations which govern the standard procedures in the operating room. In the instant case the appellants alleged that the hospital acted negligently in failing to have regulations requiring that all instruments inserted into the body of the appellant-wife be counted upon their removal and during the closing of the incision while the patient remained in the operating room. The lower court should have instructed the jury that the hospital was jointly and severally liable with the surgeon, if the surgeon were found liable, because of the hospital's failure to require an instrument count.

The trial court did not so instruct the jury, but instead noted in his charge that the question of whether such a regulation should have been in force was a question for the jury. Further, in passing on such question, the jury was instructed that "[i]f a count were required in the rules of a hospital the surgeon in charge would have to participate in it; he would have to take the time that was explained to count the instruments after the operation and while the patient lay there on the table with her body open and exposed—and one witness said that would involve problems of the anesthesia to run out and for her to come to, and also the other problems of weakness and the failure to close the wound as promptly and as reasonably as could be done."

The trial court's charge was in error with respect to the problems attendant to the performance of an instrument count, and the charge misrepresented the

actual manner in which an instrument count is made. An instrument count can be quickly and efficiently conducted. I have done considerable research in this area, and I believe that the courts of this Commonwealth may take judicial notice of the following: An instrument count is very similar to a sponge count which is conducted in every major hospital in Pennsylvania. Briefly, before an operation commences, an instrument tray is set up containing the various types of instruments needed during an operation. These instruments range in size from needles to twelve-inch clamps which may be inserted into the body during the course of the operation. The instruments are arranged on the tray by means of a pattern, with each type of instrument having its designated location on the tray. The number of each type of instrument on the tray is noted by a nurse charged with preparing the tray.

During the operation the surgeon calls for various types of instruments which are handed to him from the instrument tray. At the conclusion of the operation the surgeon and his assistants remove all sponges and instruments. The number of sponges used oftentimes exceeds the number of instruments used. The sponges are uniformly counted and in certain hospitals so are the instruments. In other hospitals, such as the one used by the defendant in the instant case, the instruments are not counted. In any event, the count of the instruments, which may be done by replacing each instrument to its proper place on the instrument tray, can be accomplished, as is the sponge count, immediately during the closing of the incision. Thus, the treatment of the patient would not be impaired. If it should turn out, however, that an instrument has been left in the patient, then the surgeon can make an informed decision as to whether the incision which may still be opened or may be partially or wholly stitched should

then be, if closed, re-opened while the patient is still under anesthesia and hospital personnel are available. In many instances this is thoroughly appropriate as it is simple to open a newly closed incision, and remove an abandoned instrument, which procedure takes only a few minutes and is without danger to the patient. Indeed, this would seem preferable to having the patient undergo a second operation with the attendant risks of administering a wholly new anesthesia a second time.

Since the instrument count is performed by the nurse in charge of the instrument tray, there is no basis whatsoever for the allegation that the patient must lie with an exposed wound that cannot be closed because the surgeon is participating in the instrument count. No countervailing reason exists, therefore, for a hospital's failure to require an instrument count as there is no material inconvenience attendant to same. The benefits of such a count may be major as the leaving behind of an instrument may very well be fatal to a patient.

In such circumstances the principles set forth in the leading case of *The T. J. Hooper,* 60 F. 2d 737 (2nd Cir. 1932), are applicable. In *The T. J. Hooper,* Judge Learned HAND writing for the distinguished court consisting of himself, Judge SWAN and Judge Augustus HAND, held that operators of tug boats which were then not generally equipped with radios to receive weather reports were negligent as a matter of law where a barge sank as a result of the tug boat not receiving a weather report of stormy weather. In seminal language which has been adopted in many jurisdictions throughout this country,[3] Judge HAND wrote "An adequate receiving

---

[3] See *Wellenheider v. Rader,* 49 N.J. 1, 7-8, 227 A. 2d 329 (1967), citing Dean Prosser to the effect that "[e]ven an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard. . . . And

set suitable for a coastwise tug can now be got at small cost and is reasonably reliable if kept up; obviously it is a source of great protection to their tows. . . . They can have at hand protection against dangers of which they can learn in no other way.

"Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. *It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.* . . . But here there was no custom at all as to receiving sets; some had them, some did not; the most that can be urged is that they had not yet become general. Certainly in such a case we need not pause; when some have thought a device necessary, at least we may say that they were right, and the other too slack." 60 F. 2d at 739, 740. (Emphasis added.)

---

if the only test is to be what has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety. . . . Much the better view, therefore, is that of the great majority of the cases, that every custom is not conclusive merely because it is a custom, and that it must meet the challenge of 'learned reason', and be given only the evidentiary weight which the situation deserves. It follows that where common knowledge and ordinary judgment will recognize unreasonable danger, what everyone does may be found to be negligent; and that there will be extreme cases where it is so clearly negligent in itself that it may even be excluded from evidence." Prosser, Torts §33, 170 (3d ed. 1964). See also cases cited in Prosser, supra.

Moreover, the principle set forth in *The T. J. Hooper* is consistent with our own case law which holds that "[c]ustomary methods do not furnish a conclusive test on the question of negligence: Maize v. Atlantic Ref. Co., 352 Pa. 51, 57, 41 A. 2d 850. 'In the piquant language of Mr. Justice HOLMES: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not:" Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 470'." *Donnelly v. Fred Whittaker Co. et al.,* 364 Pa. 387, 390, 72 A. 2d 61, 63 (1950).

Insofar as it was absolutely indefensible for the hospital in the instant case not to require an instrument count at the time that the operation was being concluded, I believe that this case should never have gone to the jury. I would vacate the verdict below to the extent that I would order that a directed verdict against the hospital association be entered.

I would remand this case with a procedendo.