Milton MAZER, Administrator of the Estate of Israel Abrams, deceased, Appellant,

v.

Hattie LIPSCHUTZ, Executrix of the Estate of Benjamin Lipschutz, deceased, Appellee.

Milton MAZER, Administrator of the Estate of Israel Abrams, deceased, Appellant,

v.

Dr. Peter CHODOFF, Defendant and Third-Party Plaintiff,

v.

Hattie LIPSCHUTZ, Executrix of the Estate of Benjamin Lipschutz, Deceased,

and

The Albert Einstein Medical Center, Southern Division, Third-Party Defendants, Appellees.

Nos. 14238–14239.

United States Court of Appeals Third Circuit.

Argued June 3, 1963.

Decided Dec. 30, 1963.

Rehearing Denied in No. 14238 Feb. 26, 1964.

Harvey B. Levin, Lazarus & Levin, Philadelphia, Pa. (Bernstein & Bernstein, Philadelphia, Pa., on the brief), for appellant.

John B. Martin, Philadelphia, Pa. (John M. Ross, Duane, Morris & Heckscher, Philadelphia, Pa., on the brief), for appellee Lipschutz.

Francis E. Shields, Philadelphia, Pa. (Pepper Hamilton & Scheetz, Philadelphia, Pa., on the brief), for appellee Dr. Peter Chodoff.

Before BIGGS, Chief Judge, and McLAUGHLIN and GANEY, Circuit Judges.

BIGGS, Chief Judge.

■ Jurisdiction in the suits at bar is based on diversity and jurisdictional amount. The operative facts occurred in Pennsylvania and the law of that Commonwealth therefore is applicable. The jury could have found the following from the evidence.

Israel Abrams was an Assistant Professor of Mathematics at Drexel Institute and was admitted to The Albert Einstein Medical Center, Southern Division, in Philadelphia, on December 17, 1957, on the surgical service of Dr. Benjamin Lipschutz for elective [1] gall bladder surgery. Professor Abrams was placed in Room 807. On the same day another patient, also named Israel Abrams, was admitted to the hospital and was put in Room 342. Albert Kohn, head technician in charge of the hospital's blood bank, and Dr. Peter Chodoff, the anesthesiologist who was to serve and who did serve at Professor Abrams' operation, acting independently of each other, checked the operating schedule on December 18, the day before Professor Abrams' operation took place. On that day Dr. Chodoff ordered the blood bank to set aside two bottles of blood for Professor Abrams. Kohn checked the hospital census and found that an Israel Abrams was registered in Room 342. He called the "I–V" (Intravenous) team and ordered that a specimen of that Israel Abrams' blood be typed. On typing, this blood was found to be type "A." About mid-afternoon on December 18, Kohn was informed there were two Israel Abrams in the hospital. He checked with the operating room and found that Professor Abrams was in Room 807 and it would seem, though the record is not clear on this point, that he then called for a specimen of the Professor's blood for typing. A specimen of blood was delivered to him.

On the morning of the operation, which took place on December 19, a bottle of blood was placed in the operating room for use in connection with Professor

---

1. The operation is described as "elective" because it was not emergent and was

scheduled to take place near the beginning of the winter recess of Drexel Institute.

Abrams' operation. Dr. Chodoff stated that the bottle of blood was labeled "Israel Abrams" and that the operating room chart showed that the bottle was marked "342 A Positive." Kohn testified that he himself put the label on this bottle. The operation was proceeded with by Doctor Lipschutz as the operating surgeon and during its course, Professor Abrams' cystic artery was severed. Professor Abrams went into shock and blood was imperatively required. Dr. Chodoff looked at the bottle of blood and noticed immediately that it was labeled in substance as stated.

Kohn was summoned to the operating room and was asked by Dr. Chodoff about the apparently erroneous labeling of the bottle of blood. Kohn told Dr. Chodoff that the room number was a clerical error, that the blood was of the correct type and that it was proper to give it to Abrams.[2] According to Dr. Chodoff, Kohn stuck his head through the open operating room door. According to Kohn's testimony, he talked to Dr. Chodoff in the operating room through the open door of the adjacent scrub room. Both Dr Chodoff and Kohn agreed that they were separated by a distance of about five feet. One pint of blood was given from the bottle, marked as we have stated, to Professor Abrams. Five other pints of blood were also given to him. There was evidence from which the jury could have inferred that some of the blood given to Professor Abrams was of an incompatible type. The trial court stated in its charge: "[I]t seems to be taken without argument that there was a wrong room number on the bottle of blood."

A sponge count was taken after the incision in Professor Abrams' abdomen had been closed and it was found that two sponges were missing. Approximately one-half hour after the operation, Dr. Lipschutz returned Professor Abrams to the operating room, reopened his abdomen, and removed one sponge but left the other within the patient.

On December 23, Professor Abrams, then suffering from acute kidney failure, a transfusion reaction, was transferred by Dr. Lipschutz to the University of Pennsylvania Hospital and put under the care of Dr. Lewis Bluemle, a specialist in the use of the artificial kidney. Dr. Bluemle testified that Dr. Lipschutz twice denied knowledge of the occurrence of any transfusion reaction. Dr. Bluemle testified that on the second denial, "I rather abruptly telephoned the blood bank of the Albert Einstein Hospital in Dr. Lipschutz's presence and asked the technician in charge the blood type of Mr. [Professor] Abrams and was told it was Type O, Rh-positive. * * * I presented this information to Dr. Lipschutz at that time and he said yes, there was a possibility that a transfusion reaction had occurred * * *." Dr. Bluemle also testified that because of increasing pain suffered by Professor Abrams in the right upper part of the abdomen and in the shoulder, indicating something wrong in the area of the liver or in the area of the right diaphragm, an X-ray was taken of this area at the University of Pennsylvania Hospital and the sponge remaining in the patient's abdomen was discovered. Dr. Bluemle stated that "the presence of a foreign body of this sort in the abdomen can hasten the development of uremia * * *."

Professor Abrams died on January 4, 1958. There was ample evidence that the administration of the wrong type of blood was a substantial factor in causing his death and also that it was the sole cause of death. There was also proof that the unremoved sponge was a con-

---

2. Kohn testified during a pretrial deposition and again early in the trial that he was not aware until after the operation that there were two Israel Abrams in the hospital. He stated also that blood had been taken from only one Israel Abrams for the blood bank. But when a written statement, which pretrial discovery methods had failed to elicit, was shown to him he testified that he did know there were two Israel Abrams in the hospital and that blood had first been drawn for the blood bank from the Israel Abrams in Room 342.

tributing cause. Two suits were brought by Professor Abrams' administrator. One (C.A. No. 25,749 in the court below) was originally filed against Dr. Lipschutz and continued after his death against his executrix as substituted party. The second suit (C.A. No. 27,438 in the court below) was filed against Dr. Chodoff, the anesthesiologist whose admitted duty it was to administer and who did in fact administer the blood transfusions. The two cases were consolidated for trial and, properly, were tried together.[3]

Three interrogatories were submitted to and answered by the jury on the issue of fault. The interrogatories and the jury's answers to them were as follows: "1. Was there negligence on the part of Dr. Chodoff which was a contributing cause of the death of Israel Abrams?", "Answer: No."; "2. Was there individual negligence on the part of Dr. Benjamin Lipschutz which was a contributing cause of the death of Israel Abrams?", "Answer: No."; "3. Was there negligence on the part of any employee of Albert Einstein Medical Center, Southern Division, other than Dr. Chodoff['s] which was a contributing cause of the death of Israel Abrams?", "Answer: Yes." After the third interrogatory the court gave the following instruction: "If you answer any or all of the foregoing questions 'yes,' then answer the following." The "following" questions related to the amounts of damage, if any, suffered by the plaintiff. Because the plaintiff had previously executed a release in favor of the hospital, in the light of the two exculpatory answers of the jury, the findings, with the consent of the parties, were molded into verdicts in favor of the two individual defendants. The plaintiff then filed in the suit against Lipschutz's executrix (C.A. No. 25,749 in the court below) a motion to set aside the judgment and enter judgment for the plaintiff, and, in the alternative if the first motion was denied, a motion for a new trial. In the case against Dr. Chodoff (C.A. No. 27,438 in the court below), in which Dr. Lipschutz's executrix and the Albert Einstein Medical Center were joined as third-party defendants, the plaintiff filed a motion for a new trial. The motions were denied and the appeals at bar followed. The appeal from C.A. No. 25,749 is at our No. 14,238; that at C.A. No. 27,438 is at our No. 14,239.

The plaintff has asserted a number of grounds in this court as to why the judgment should be reversed and the verdict molded and judgment entered against Dr. Lipschutz's executrix for the amounts awarded as damages by the jury, and in the alternative that a new trial be granted. In Dr. Chodoff's case the plaintiff contends that a new trial should be granted.

The first ground for reversal asserted by the plaintiff is bottomed on the "Captain-of-the-Ship" doctrine and is to the effect that under the law of Pennsylvania the operating surgeon, Dr. Lipschutz, as the captain of the ship was legally responsible for the negligence which caused Professor Abrams' death. The plaintiff cites three Pennsylvania cases to support his position.

The first of these is McConnell v. Williams, 361 Pa. 355, 65 A.2d 243 (1949). In this case Mrs. McConnell consulted the defendant doctor to attend her during a pregnancy and to deliver her child. The doctor found that a caesarian operation was necessary and caused it to be performed at a Philadelphia hospital where he was one of the chiefs of the obstetrical staff. The hospital was a nonprofit, charitable institution with both private-patient and ward service, its facilities being available to all persons. The defendant doctor requested one of the hospital internes to attend on the day of the caesarian operation "to be his assistant and to take care of the

---

3. The jury awarded $41,365 under the Survival Act (20 P.S. § 320.601 et seq.), and $47,953 under the Wrongful Death Act (12 P.S. § 1601 et seq.). Damages against Dr. Lipschutz were claimed on the basis of both Acts. Damages against Dr. Chodoff were asserted on the basis of the Survival Act only. The application of these Pennsylvania Acts is not in issue here.

baby at the time of the operation," but being told that that interne would not be on duty he asked that a certain other interne should be informed that "he was to be his assistant and take care of the baby at the time of the delivery." The operation took place as scheduled and there were present in addition to the defendant doctor and the patient a nurse attached to the hospital, another nurse privately engaged by the patient, and the interne whom the defendant doctor had last designated.

The patient suffered profuse hemorrhages which required the defendant doctor's complete attention. When the child was delivered he turned it over to the interne for the purpose of tying the umbilical cord and applying a solution of silver nitrate to its eyes, the latter service being required by the rules and regulations of the Department of Health of the Commonwealth of Pennsylvania. According to the testimony the interne filled a syringe and squirted the solution once into the child's left eye and twice into its right eye, putting into the latter "a great many drops," and failed to irrigate the eyes during at least the following five or ten minutes. The child lost the sight of its right eye and its left eye was severely and permanently scarred. The defendant doctor testified that the insertion of silver nitrate drops was not a task that required any special skill. Mr. Justice (later Mr. Chief Justice) Horace Stern said that the plaintiffs did not charge the defendant doctor personally with any act of negligence, either of commission or omission, but that the testimony made out a prima facie case of negligence against the interne, and that therefore "the only legal question involved is whether the doctrine of respondeat superior applies, that is to say, whether, for the purpose of and during the course of the operation, which included the immediate caretaking of the infant child, the interne was, in the view of the law, the servant or employee of defendant [doctor]."

The Supreme Court stated that the defendant doctor chose to "borrow from the hospital an interne who thereby became—or so at least a jury might find—his temporary servant or employee for the purpose for which he was engaged," that the defendant doctor himself testified that he had complete control of the operating room and every person within it while the operation was in progress and that tying the cord and inserting the silver nitrate in the infant's eyes were part of the operation. We state the gist of the ruling, applicable to the case at bar, in the words of Mr. Justice Stern, "[The operating surgeon] is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board * * *." 65 A.2d 246. The court relieved the plaintiff of judgment of nonsuit and remanded the case for a new trial.

The second case is Yorston v. Pennell, 397 Pa. 28, 153 A.2d 255 (1959), in which Mr. Justice McBride wrote the majority opinion. The facts were as follows. The plaintiff was injured when a nail ricocheted from a ramset gun he was using, entered his right leg and fractured the fibula. He was taken to the hospital where he became a patient of the defendant doctor. Yorston was allergic to penicillin, a fact which had been discovered by his family doctor a few months prior to the accident. The family doctor had written a note on one of his prescription blanks stating that Yorston was "never" to receive penicillin "under any circumstances." When Yorston got to the hospital he showed the note to one of the nurses and to Dr. Rex, a junior interne. Yorston's wife, who arrived at the hospital shortly after he was admitted, also showed the note to one of the nurses and told another interne that there was a note about an allergy that she had given to the nurse and also that Yorston was allergic to tetanus antitoxin.

Yorston was tested for allergy to tetanus antitoxin and the test proved negative. He was not tested for penicillin allergy. While Yorston was still in the receiving ward another doctor, Dr. Hatemi, was called to the ward. Dr. Hatemi was a graduate of a medical school in

Iran, had spent an internship of a year in a Boston City hospital, and had been appointed a surgical resident at the hospital where Yorston was treated. X-rays were taken and Dr. Hatemi and Dr. Pennell discussed procedures to be followed in respect to Yorston. Yorston was then brought into the operating room, to be operated upon by Dr. Hatemi. At this point Dr. Rex, recalling that though he had been informed that Yorston was allergic to penicillin he had nonetheless neglected to note this fact in Yorston's written history, went to the door of the operating room. Since he was non-sterile and not properly clad for entering the room, Dr. Rex called the nurse anesthetist to the door and asked her to make a notation on Yorston's history that he was allergic to penicillin.

Yorston testified that Dr. Pennell was in the operating room prior to the operation and lifted his leg by the big toe. Dr. Hatemi administered spinal anesthesia. The nail was extracted. As the operation was drawing to a close Dr. Hatemi dictated the post-operative orders and prescribed 600,000 units of penicillin to be administered to Yorston every four hours. Two such administrations were made albeit Yorston informed the nurse on duty that he was allergic to penicillin. Yorston received a third dose despite the fact that apparently he told everyone with whom he came into contact about his penicillin allergy. He testified that on one occasion when Dr. Hatemi and Dr. Pennell were present Dr. Hatemi said he was giving the patient "oremycin" and that Dr. Pennell told him to give Yorston 25,000 units of penicillin. The penicillin treatment finally ceased after a final protest by the patient. Within a short time thereafter Yorston suffered a cerebrovascular accident as a direct result of penicillin reaction.

Mr. Justice McBride said, 153 A.2d 261, "Neither Dr. Pennell nor Dr. Hatemi would be responsible for the acts of agents of the hospital, such as nurses who administered penicillin post-operatively on their own or at the instance of other physicians. Here, the penicillin was administered specifically because of the directions of Dr. Hatemi given while in the operating room and so recorded on the chart. * * * "

Mr. Justice McBride went on to say that Dr. Pennell "was present in contemplation of law since his personally chosen agent performed the operation" and that "[w]hen that personally chosen agent performed the operation the hospital employees assisting in it who ordinarily would not be servants either of Dr. Hatemi or Dr. Pennell became, during that operation at least, the agents of Dr. Pennell through the agency of Dr. Hatemi."

The Supreme Court of Pennsylvania called attention to Benedict v. Bondi, 384 Pa. 574, 122 A.2d 209 (1956), to Shull v. Schwartz, 364 Pa. 554, 73 A.2d 402 (1950), and to Scacchi v. Montgomery, 365 Pa. 377, 75 A.2d 535 (1950).

The third decision on which the plaintiff relies is Rockwell v. Kaplan, 404 Pa. 574, 173 A.2d 54 (1961). The opinion in this case must be read in conjunction with that of Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961), since the latter opinion's statement of facts supplements that of the former. Both these cases involve a single improper administration of sodium pentothal as a preliminary anesthetic to the general anesthesia of Benjamin Rockwell, prior to an elective bursa operation. The drug was so badly administered by a resident physician at the hospital, pursuant to the direction of the chief of the anesthesiology department, Dr. Stone, that the vein was missed and the sodium pentothal was injected either into an artery or its surrounding tissue causing an arterial spasm and subsequent blood clotting, resulting finally in the amputation of Rockwell's arm. Ordinary medical care would have required immediate blocking by procaine, but this technique was not made use of. On the contrary the bursa operation was proceeded with at once.

The sodium pentothal had been administered in the "induction room" which was found to be "under the direction,

control and supervision of Dr. Stone." He, then and there, was the "captain of the ship." 173 A.2d 50. The operating surgeon was Dr. Kaplan and he too was held liable. Dr. Kaplan moved for judgment n. o. v. and in the alternative for a new trial on the ground there was no proof of his negligence. Two dissenting Justices pointed out that insofar as Dr. Kaplan, the operating surgeon, was concerned, there was no evidence of any negligence on his part and that his "liability, if any, must be premised on the theory of vicarious liability." The dissenting Justices posed the following inquiry: "[I]s Dr. Kaplan liable for malpractice under the doctrine of respondeat superior for an act of negligence which occurred, outside his presence and without his knowledge, during the preoperative procedure involved in the administration of an anesthesia?" 173 A.2d 57.

Mr. Justice Bok, speaking for the majority, said: "Dr. Kaplan's liability rests on two piers, either one of which will support it: his own negligence and his responsibility as principal for Dr. Stone's negligence, which has been established by the companion case of Rockwell v. Stone, supra." 173 A.2d 55. As to the second pier, Mr. Justice Bok, after referring to Mr. Chief Justice Stern's "famous analogy of the ship captain," went on to quote from McConnell v. Williams, supra, as follows: "But for the period of the operation itself the situation is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations." 173 A.2d 56. He then said: "It is clear, under Yorston v. Pennell, 1959, 397 Pa. 28, 153 A.2d 255, that doctors are subject to the law of agency and may at the same time be agent both of another physician and of a hospital, even though the employment is not joint.

"This establishes the theory of respondeat superior and also answers the heart of defendant's motion for a new trial." 173 A.2d 57. The judgment against Dr. Kaplan was affirmed.

As we have stated, the jury found in answer to the third interrogatory that the negligence of an employee of the Albert Einstein Institute was a contributing cause of the death of Professor Abrams. The correctness of this finding may not be questioned for there was uncontrovertible evidence that Professor Abrams' death resulted, at least in part, from the transfusion of incompatible blood during the course of the operation. Some of that blood was in a bottle in the operating room though the record is not clear as to how it got there. The jury finding on this point cannot be disturbed. Cf. Lind v. Schenley Industries, Inc., 278 F.2d 79 (3 Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). There was evidence, already alluded to in this opinion, that Dr. Chodoff, suspecting from the designation on the bottle that it might not contain blood of the type required by Professor Abrams, called Kohn, the technician in charge of the hospital's blood bank and questioned him. Putting his head at or through the open operating room door, Kohn told Dr. Chodoff in the presence of Dr. Lipschutz that the blood was of the correct type for the patient. The transfusion was an essential, an integral, part of the operating procedure. It took place in the operating room where Dr. Lipschutz was the captain of the ship. The statement made by Kohn caused the transfusion to be proceeded with.

We can perceive no valid distinction between the principle applicable to the case of Dr. Lipschutz and that derived from Yorston v. Pennell and Rockwell v. Kaplan, supra. In Yorston, it will be recalled that not only did the hospital staff receive repeated notice of Yorston's allergy but also during the operation, Dr. Rex to whom the original notice had been given came to the door of the operating room and asked the anesthetist to make a note on Yorston's chart as to the allergy. But this was not done. The Su-

preme Court of Pennsylvania stated in this connection: "If the nurse failed to correct the history or inform Dr. Hatemi [the operating surgeon] her negligence is apparent." 153 A.2d 260. Note the factual similarity of the case at bar where Dr. Chodoff called Kohn to the operating room and was assured by him that the bottle contained blood of the correct type for Professor Abrams' transfusion. Observe also that in Rockwell v. Kaplan, the operating surgeon, Dr. Kaplan, as captain of the ship, was seemingly held accountable not only for the individual negligence of the anesthesiologist, Dr. Stone over whom he did not have any realistic measure of control but also, similarly, for the preoperative error of a hospital interne effected outside of the immediate confines of the operating room.

■ In view of the foregoing it follows that the jury under proper instructions would have been entitled to find Dr. Lipschutz, as the captain of the ship, vicariously liable for the administration of incompatible blood to · Professor Abrams. It is not necessary to go outside the operating room because Kohn's statement to Dr. Chodoff, respecting the correct typing of the blood, was made, if we take the evidence most favorable to the plaintiff, with Kohn's head inside the operating room and only a few feet away from the operating surgeon, Dr. Lipschutz. But even if we take the position must unfavorable to the plaintiff, Kohn was in the scrub room but little more than five feet away from Dr. Lipschutz. See Rockwell v. Stone and Rockwell v. Kaplan, supra. The evidence demonstrates that Kohn may have been aware that there ·were two Israel Abrams in the hospital. The jury could have found that he possessed this knowledge and if they did so, under proper instructions, they could also have found specifically that Kohn's reply to Dr. Chodoff's inquiry constituted negligence. There can be no doubt that incompatible blood arrived in the operating room because of negligence. Did Kohn become the agent of Dr. Lipschutz at the time

he was summoned to the room and replied in answer to Dr. Chodoff's inquiry that the blood was suitable and therefore render Dr. Lipschutz liable for any negligence on the part of Kohn under the captain of the ship doctrine? The jury made no specific finding of the application of the doctrine of respondeat superior either as to Dr. Lipschutz or Dr. Chodoff in respect to the actions of Kohn and the hospital's blood-bank group. The next question is, was there any charge to such effect? Again the answer is in the negative. We come then to the next question. Was there any sufficient request for a charge by the plaintiff which would have covered this vital issue?

Prior to the charge, the plaintiff submitted an additional point for charge, viz., plaintiff's request "No. 10." This was as follows: "I charge that if the incompatible blood administered to Israel Abrams resulted from any negligent act or acts committed by an employee or employees of the Albert Einstein Medical Center, Southern Division, that Dr. Lipschutz and therefore his Estate would be responsible by reason thereof." The court denied this request.

At the close of the charge plaintiff objected to the failure of the court to give the instruction quoted above, as follows: "I would like to have an exception, for the record * * * to that portion of Your Honor's charge that Dr. Lipschutz was not responsible for any other employees than those in the operating room." The court replied: "In line with that point for charge, yes, you may have an exception."

■■ Neither the request embodied in the request for charge No. 10 nor the exception to the charge by the plaintiff would have served to put before the jury fairly and adequately the issue of whether or not Kohn was the agent of Dr. Lipschutz according to the test in Rockwell v. Kaplan supra, or whether Kohn was negligent. The plaintiff made no request in any way relating to the vicarious liability of Dr. Lipschutz save request No. 10, and even in this request he did not attempt to spell out or to

have the court charge in any clear or precise way the application of the captain of the ship doctrine to Dr. Lipschutz for the actions of Kohn. When we say this we do not mean to suggest that it was necessary for the plaintiff to request the court to give the jury a lesson in Latin, but it was the duty of the plaintiff, if he desired a charge based on the vicarious liability of Dr. Lipschutz, to request it in the terms required by Rule 51 and when it was not given by the court upon request and as requested, to make clear and unambiguous objections to the court's action or lack of it so that the trial judge could correct his error or errors. Moreover, the plaintiff did not request the submission to the jury of any interrogatory respecting Kohn's statement at the operating room door in relation to Dr. Lipschutz. See Rule 49. The plaintiff made no objection to the interrogatories as submitted. One may surmise, perhaps, why such requests were not submitted by the plaintiff and why no objections were made to the interrogatories as submitted to the jury. It is possible that the plaintiff was relying on what he presumed to be the "individual" negligence of Dr. Lipschutz. But whatever may be the reason, the plaintiff's request for charge on the basis of the imposition of vicarious liability and his post charge objection were insufficient.

The trial judge apparently took the view that liability could not be imposed on Dr. Lipschutz or Dr. Chodoff under a doctrine of vicarious liability resting on the negligence of "the other hospital employees." This phrase is cryptic. So that it may appear against its proper background, we quote this portion of the charge more fully. It was as follows: "As to Dr. Lipschutz there are two bases of negligence. * * * One of them is called * * * 'vicarious liability.' That means simply that one may be liable for * * * the negligent acts * * * of another * * *." The court went on to charge that the term vicarious liability "simply means

that one individual is liable for the negligent acts of another individual even though the first one did not actually commit the negligent acts." The trial judge said: "Under the law of Pennsylvania * * * a surgeon in an operating room is the principal. He is in command. He is * * * responsible for the negligence of those of the personnel in the operating room who are under him, among whom would be the anesthesiologist; so that if you find that Dr. Chodoff was negligent there would automatically be a similar finding against Dr. Lipschutz." The trial court also said: "I should charge you that neither Dr. Lipschutz nor Dr. Chodoff is vicariously liable in the way I have defined that term *for any of the acts of the other employees of the hospital, including the employees in the blood bank, Mr. Kohn, and whoever else may or may not have been negligent.* The negligence of Dr. Chodoff in this case stems from his individual negligence, if you find that there was such, if you find that he should under the circumstances of this case have taken additional precautions and failed to do so. It is only his individual negligence that I am talking about in respect to Dr. Chodoff. And in respect to Dr. Lipschutz, in the question that I am submitting to you it is only his, Dr. Lipschutz's, individual negligence, not his responsibility as derived from Dr. Chodoff's negligence, if you find such to be the fact. But neither one of them is responsible *for any negligence,* if there was such, *on the part of any other employees of the hospital.*" [4] (Emphasis added.)

This part of the charge was erroneous as to Dr. Lipschutz for the reasons that we have stated and also was unclear. But there was no objection on the part of the plaintiff's counsel to it on any ground except as indicated. As we have stated the provisions of Rule 51 were not complied with by plaintiff's counsel. It is clear that no verdict could or can be molded in favor of the plaintiff in view of the charge.

4. T. pp. 820–823.

The plaintiff insists that there was fundamental error because the third interrogatory should not have been propounded in conjunction with the two first interrogatories, that the jury should have been instructed to answer the damage interrogatories only if their answer to the first or second interrogatories was yes or their answers to the two first interrogatories were yes and that the instruction as to the interrogatories was fundamentally erroneous because the jury could have thought an affirmative answer to the third interrogatory could have supported an award for damages despite the negative answers to the first two interrogatories. The point is very far from being a potent one for what the plaintiff's counsel belatedly urges in this respect is purely speculative, but the very plain error of the wrong charge referred to in the paragraph immediately preceding this remains to be disposed of.

■■ There was plain or fundamental error in the charge and it was highly prejudicial. As was said in McNamara v. Dionne, 298 F.2d 352, 355 (2 Cir. 1962): "An appellate court may, in its discretion, disregard Rule 51 when the error claimed is plain and may result in a miscarriage of justice * * *." This power should be exercised sparingly and we are aware of this precept. Cf. Johnson v. United States, 318 U.S. 189, 200, 63 S.Ct. 549, 87 L.Ed. 495 (1943). We think there was a miscarriage of justice in Dr. Lipschutz's case. The ruling of the court below involves the safety of the public and is of great consequence to anyone who must submit to surgery in the Commonwealth of Pennsylvania. The error involved is plain. Under the circumstances, therefore, the plain error doctrine may be applied. See McNello v. John B. Kelly, Inc., 283 F.2d 96, 102 (3 Cir. 1960). The applicable principle was laid down in this circuit in Callwood v. Callwood, 3 Cir., 233 F.2d 784, 788 (1956) and in Robinson v. Pennsylvania R. R. Co., 3 Cir., 214 F.2d 798, 802 (1954). We apply it to Dr. Lipschutz's case. We will order a new trial.

■ Rule 59(a) provides that a new trial may be granted on all or part of the issues. Here as in Furr v. Herzmark, 92 U.S.App.D.C. 350, 206 F.2d 468, 472 (1953), though the issue in the end is the single one of Dr. Lipschutz's negligence, "yet in fact this issue divides into several different issues * * *." One of these issues was designated in interrogatory No. 2 as "individual negligence on the part of Dr. Benjamin Lipschutz which was a contributing cause of the death of Israel Abrams," and the jury answered this interrogatory in the negative. It would not be fair under the circumstances to cause the issue of Dr. Lipschutz's individual negligence, in the sense that we believe the phrase "individual negligence" was used in the interrogatory, to be retried or to grant a new trial to the plaintiff on any ground other than Dr. Lipschutz's vicarious liability in relation to Kohn as delineated above.

■ As to the appeal in the suit against Dr. Chodoff, we conclude there was no plain or fundamental error in the charge. Dr. Chodoff was not the captain of the ship. Dr. Lipschutz was. To say that Dr. Chodoff was the anesthesiologist and as such was in charge of the transfusion and was therefore responsible for Kohn's seeming negligence would, in our opinion, extend the ship's captain doctrine too far beyond the present bounds of the law of Pennsylvania. Certainly it would grossly distort that law to say that it is plain error to fail to charge a jury that there can be two captains of the ship at one and the same time. The Supreme Court of Pennsylvania has never held that there can be two captains of the ship simultaneously. Moreover, what implication can be gathered from the only decision which we can find which is at all relevant to this issue, Rockwell v. Stone, supra, points in the opposite direction.

The Rockwell cases, supra, it will be remembered, were suits against the operating surgeon, Dr. Kaplan, and the anesthesiologist, Dr. Stone. Dr. Stone was held vicariously accountable for a

negligent act of anesthesiology which had taken place immediately preceding the operation and in the induction room adjacent to the operating room. At that time and place an injection of sodium pentothal had been given by Dr. Jiminez, a resident physician and hospital employee in the anesthesiology department of the hospital. Mr. Justice Jones, speaking for the Supreme Court of Pennsylvania, stated, 173 A.2d at p. 50: "This accident or mishap took place in the induction room of the hospital in which room all the procedures and all the personnel were under Dr. Stone's direction and control. While the personnel who prepared Rockwell for surgery were hospital employees, they then acted under the direct supervision and control of Dr. Stone: Dr. Jiminez was a resident taking graduate work in anesthesiology and Molnar was a registered nurse taking advanced work in anesthesiology. The record indicates that the Department of Anesthesiology was alerted to Rockwell's impending surgery and that Department, under the aegis of Dr. Stone, set up sodium pentothal as the inducing anesthesia to be followed by a general anesthesia of cyclopropane gas, ether and oxygen. All that took place in the induction room was under the direction, control and supervision of Dr. Stone: *at that time and place he was 'captain of the ship'.*" (Emphasis added.)

 We conclude also that the plain error doctrine may not be invoked to support the vicarious responsibility of Dr. Chodoff for the negligence of Kohn or of the employees of the hospital blood bank under Pennsylvania legal standards of respondeat superior generally, as distinguished from that imposed by the captain of the ship doctrine, for the doctrine of respondeat superior presupposes a master and servant relationship under which the master has the right of control over the manner of performance by the servant. No evidence was presented in the proceedings below that Dr. Chodoff had any such control over Kohn or the hospital's blood bank. The blood bank employees were not shown to be other than independent contractors in the traditional sense as regards their relationship to Dr. Chodoff, and it is the Pennsylvania as well as the universal view that such a relationship does not serve as a basis for vicarious responsibility. See Mature v. Angelo, 373 Pa. 593, 97 A.2d 59 (1953), and the cases cited therein. This point is conceded.[5]

5. That the administrator of Israel Abrams was not attempting to hold Dr. Chodoff liable at the trial on any doctrine of vicarious liability, whether it was of the captain-of-the-ship or of the respondeat superior category, was made plain by a colloquy between the court and counsel at t. pp. 660–661, prior to the argument of counsel to the jury:

"The Court: Well, plaintiff has stated that there is no liability on the part of Dr. Chodoff for any negligence of the employees of the blood bank.

"Mr. Shields (counsel for Dr. Chodoff): He has conceded that to us privately.

"The Court: No, he conceded that at the argument on the motion.

"Mr. Shields: Yes, but that was not before the jury.

"The Court: Well, I would so charge the jury.

"Mr. Shields: If you so charge the jury and limit Mr. Levin in his argument —I think both things are necessary.

"Mr. Levin (counsel for the plaintiff): Your Honor, so far as argument is concerned, I think there is a point here in the case that Dr. Chodoff from his own testimony had the right at the time that he was checking this bottle of blood to direct Mr. Kohn to recheck a sample of blood. I think that of itself is an element of evidence in the case that goes to Dr. Chodoff's responsibility.

"The Court: Yes, but that is not vicarious responsibility for anything that Kohn or anybody in the blood bank might have done.

"Mr. Levin: No, it is not.

"The Court: It is a part of the picture of Dr. Chodoff's negligence, if any there is.

"Mr. Levin: That is right. You recall at the argument on motions Mr. Shields made the point that after all Dr. Chodoff did not make the rules, and could not tell the blood bank what to do, and could not hold up Dr. Lipschutz's operation and all that. This goes to the question of his power to re-check this blood.

The charge as to Dr. Chodoff was inconsistent with the inquiry of the first interrogatory, quoted above, for that interrogatory was not limited to Dr. Chodoff's "individual" negligence as was the second interrogatory limited to Dr. Lipschutz's "individual" negligence. The charge was a limitation on the scope of the first interrogatory, but we think that the limitation was a proper one in view of the fact that Dr. Chodoff was not the captain of the ship.

At the close of his argument to the jury counsel for Dr. Chodoff made a statement to which the plaintiff now vigorously objects, though his counsel took no exception to it at the time. The substance of it was that a verdict against Dr. Chodoff would be "a millstone for the rest of his life" as a professional man and that "the fragile thread of the evidence * * * is insufficient to support that millstone * * *." These statements, say the plaintiff, in and of themselves were fundamentally prejudicial, and we should sua sponte reverse because of them even in the absence of an objection. We cannot agree. The statements should not have been made. The trial court should have ordered the jury to

disregard them and should have cautioned counsel against repetition of the error. But we cannot deem what was said to be of such importance as to rise to the dignity of plain error.

Dr. Lipschutz's executrix asserts that a release executed by the plaintiff in favor of the hospital, its agents and employees, but expressly reserving rights against Dr. Lipschutz, bars the plaintiff from recovering a judgment against the doctor. Appellee's argument is pitched on the ground that the situation presented is not one of joint tortfeasors but one of primary and secondary liability. Therefore, she asserts, if the one primarily liable be discharged, the release operates to discharge anyone secondarily responsible, citing the Restatement, Security, Section 122. But the executrix has mistaken the positions of the hospital and of Dr. Lipschutz. They were joint tortfeasors, both vicariously liable. In any event, Section 122 of the Restatement provides that the surety is not discharged if as here, "the creditor in the release reserves his right against the surety." The law of Pennsylvania on the subject of joint tortfeasors is clearly applicable to this issue:

---

"The Court: All right.

"Mr. Levin: And I would not want to be limited in any respect on that points [*sic*].

"Mr. Martin (Counsel for Dr. Lipschutz's executrix): You are going to charge the jury in accordance with the stipulation made by plaintiff's attorney regarding vicarious responsibility on the part of both doctors?

"The Court: Oh, sure."

In a letter written by counsel for the plaintiff, Professor Abrams' administrator, to the presiding judge of this court on June 17, 1963, the following appears:

"With respect to Dr. Chodoff, plaintiff did not press at the trial or submit a point for charge on the issue of his responsibility as a sub-principal. The Pennsylvania cases were clear on the scope of the surgeon's duty, but there was no specific ruling on the vicarious liability of an anesthesiologist, and in view of the strong evidence of the direct negligence of Dr. Chodoff, it did not then seem wise to introduce another contested legal issue into the case. The issue was raised in the

post-trial motions. *Not having pressed it below, we did not argue the issue on this appeal.* On the merits we think the vicarious liability of the anesthesiologist, as first mate in charge of the blood, is soundly based in Pennsylvania law." (Emphasis added.)

It must be borne in mind, as is candidly admitted by the plaintiff's counsel in his letter, that the plaintiff did not see fit to argue the issue of Dr. Chodoff's vicarious liability on this appeal. And the plaintiff seems to have decided as a matter of tactics not to bring that issue forward at the trial but to rely rather on "the strong evidence of the direct negligence of Dr. Chodoff." Without regard for the provisions of our rule 24(2) (b) and our decision in United States v. Certain Land in the City of Paterson, 3 Cir., 322 F.2d 866 (1963), we are of the opinion that we cannot with propriety or fairness apply the plain error doctrine to a point abandoned by a party prior to submission of his case to the jury and not asserted in this court.

and decides it in favor of the plaintiff. See 12 P.S. Sections 2082–2089.

All other points raised by the parties do not require discussion.

The judgment in favor of Dr. Chodoff at our No. 14,239 will be affirmed. The judgment in favor of Dr. Lipschutz's executrix at our No. 14,238, will be reversed to the extent indicated and the case against Dr. Lipschutz's executrix will be remanded for a new trial on the restricted issue hereinbefore delineated.

McLAUGHLIN, Circuit Judge (concurring in part and dissenting in part).

I concur in the fine opinion of the Majority that the question of Dr. Lipschutz's vicarious liability should have been submitted to the jury. I dissent from the view that Dr. Chodoff cannot be vicariously accountable.

In the factual situation presented, before attempting to identify servants and agents, it is necessary to isolate principals, those who are susceptible to vicarious accountability. The hospital, though not in this suit, could be held a principal, this apart from the issue whether the hospital could be looked to for damages.[1] See Brown v. Moore, 247 F.2d 711, 69 A.L.R.2d 288 (3 Cir. 1957); Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961). So, too, can the doctor who contracted to perform an operation, expressly or impliedly. McConnell v. Williams, 361 Pa. 355, 65 A.2d 243 (1949); Benedict v. Bondi, 384 Pa. 574, 122 A.2d 209 (1956); Yorston v. Pennell, 397 Pa. 28, 153 A.2d 255 (1959); Rockwell v. Kaplan, 404 Pa. 574, 173 A.2d 54 (1961).

Also, under Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961), one responsible "for a step in the operative procedure, the anesthesia step," [See Rockwell v. Kaplan, 404 Pa. 574, 579, 173 A.2d 54 (1961)] can be a principal. In fact, the circumstances here are quite similar factually to those in Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961) and Rockwell v. Kaplan, 404 Pa. 574, 173 A.2d 54 (1961) at least insofar as the relationship between the doctors is concerned. In those instances, both doctors on separate appeals, by virtue of their respective responsibilities regarding the same operation, were held to be principals and subject to vicarious liability. In this appeal, Dr. Chodoff, like Dr. Stone, was in charge of the anesthesia and the blood transfusion. Like Dr. Kaplan, Dr. Lipschutz was responsible for the whole operation. Dr. Chodoff was his "agent for a step in the operative procedure, the anesthesia step." Rockwell v. Kaplan, 404 Pa. 574, 579, 173 A.2d 54 (1961).

On the question of whether Kohn and his department became the agent of Dr. Chodoff, the Majority feels that Kohn could not, because Dr. Chodoff did not have the "right of control over the manner of performance." This has been the traditional test in Pennsylvania where there was an agency situation involving a borrowed servant or an independent contractor.[2] Mature v. Angelo, 373 Pa. 593, 97 A.2d 59 (1953) and the cases cited within. See Mantonti v. Research Cottrell, Inc., 202 F.Supp. 527 (E.D.Pa. 1962). But the four Pennsylvania decisions dealing with the doctrine of Respondeat Superior in medical malpractice disputes, arising out of an operation, have not required that there be "control over the manner of performance," in order to find an agency relationship. McConnell v. Williams, 361 Pa. 355, 65 A.2d 243 (1949); Benedict v. Bondi, 384 Pa. 574, 122 A.2d 209 (1956); Yorston v.

---

1. See Michael v. Hahnemann Medical College and Hospital, 404 Pa. 424, 172 A.2d 769 (1961) which reaffirmed the rule in Pennsylvania that charities and other eleemosynary institutions are immune from liability for the torts of their agents, servants, workmen and employees.

2. In effect the problem as it appears to the Majority is: Did the hospital loan its equipment and employees to the doctors establishing a relation of master and servant, or did the hospital and its laboratory undertake to perform a specific job and be responsible to the doctors only for a result, i. e., the preparing of blood for the operation. See Mantonti v. Research Cottrell, Inc., 202 F.Supp. 527 (E.D.Pa. 1962).

Pennell, 397 Pa. 28, 153 A.2d 255 (1959); Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961); Rockwell v. Kaplan, 404 Pa. 574, 173 A.2d 54 (1961). Rather these decisions represent an attempt by the Pennsylvania Supreme Court to carve out a test of the control that will be required to make an employee of the hospital a servant of a doctor involved in an operation. In McConnell the court formulated a fiction, the so-called "captain of the ship doctrine",[3] to do away with the traditional test of control and widen a doctor's vicarious liability. The court set apart the period of an operation as one of special consideration with a special rule governing it, "in view of the high degree of protection to which an anesthetized, unconscious patient is entitled." McConnell, supra, 361 Pa. p. 362, 65 A.2d p. 246. Said the court:

> "But for the period of the operation itself the situation is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations." McConnell, 361 Pa. p. 364, 65 A.2d p. 247; Rockwell, 404 Pa. p. 579, 173 A.2d p. 56.

The restrictive connotation of captain of the ship accountability has not been strictly followed.[4] While the court in those decisions reiterated the test of "right of control over the manner of performance", its application was troublesome, for the question still facing the court was what extent of "control over the manner of performance" it would require. In Yorston, there was no mention per se of the captain of the ship test. The court there spoke of respondeat superior principles. There was no factual determination regarding whether there was control over the manner of performance as to Dr. Rex who was directed and ordered to take a case history and did it negligently. In Rockwell, the sole indication of control over the manner of performance of Dr. Stone was that Dr. Kaplan had the authority to stop the administration of the anesthesia. Although the captain of the ship doctrine was referred to, it was not determinative. The court discussed the control it would require. It noted that Dr. Stone acted on Dr. Kaplan's business; that operating surgeons should be "held liable for the negligent performance of the duties of those then working under them." Rockwell v. Kaplan, 404 Pa. 574, 579, 173 A.2d 54, 56 (1961).

Where there are specialists connected with a phase of an operation, it is highly unlikely that doctors in charge would have enough familiarity with the particular procedure to have effective control over the manner of performance. As Mr. Justice Maxey said in Silveus v. Grossman, 307 Pa. 272, 278, 161 A. 362 (1932) and Rodgers v. Saxton, 305 Pa. 479, 488, 158 A. 166 (1932), quoted in McConnell v. Williams, supra: "Responsibility is commensurate with authority." In this trial there was enough evidence to show that Dr. Chodoff had the au-

3. This doctrine asserts that as a matter of law, in the course of an operation, in the operating room of a hospital, and until the surgeon leaves the room at the conclusion of the operation, he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board. McConnell, supra, 361 Pa. p. 362, 65 A.2d p. 246.

4. In Benedict, the negligent act causing the injury probably occurred outside the operating room, i. e., the faulty preparation of the hot water bottles. The court was forced to bring somehow into the operating room the negligent act. In Yorston, the operating surgeon in fact was not in control, but subject to Pennell, the defendant doctor; the initial negligent act occurred outside the operating room, before the operation began, i. e., the making of the case history; further, the operation itself was a success. In Rockwell v. Stone, Stone was deemed captain of the ship, even though he was not present when the badly administered injection (not an operation) took place which injection was made outside the four walls of the operating room.

thority to and did order the blood from the laboratory, call Kohn to account when he saw error, and presumably order Kohn, to verify which was the proper blood, that Kohn was acting under Dr. Chodoff's orders and on his business. All of that constitutes enough control over Kohn by Chodoff as to make the latter vicariously liable. Said the court in McConnell at 361 Pa. p. 362, 65 A.2d p. 246:

> "If, then, it be true that defendant had supervisory control and the right to give orders to the interne in regard to the very act in the performance of which the latter was negligent, it would follow, according to the classical test of agency hereinbefore stated, that a jury would be justified in concluding that the temporary relationship between defendant and the interne was that of master and servant * * *."

This has been the theme reiterated and determinative in the later opinions. There is the recurring presence of a man of authority, giving orders, directing this or that be done regarding the operation.[5] Therefore, as Pennsylvania law now stands, the Supreme Court of that Commonwealth would, I think, hold Dr. Chodoff vicariously liable for Kohn's alleged negligence.

The Majority has stated that the Commonwealth's law does not contemplate two captains of the ship. That may be so, within the framework of that fiction, but the Rockwell cases indicate to me that with respect to the same operation, there can be two principals, whether or not one labels one doctor captain of the S.S. Anesthesia and the other captain of the S.S. Operation, or characterizes the relation in captain-first-mate terms.

Since the captain of the ship rule has not been categorically repudiated, the Majority is justified in holding that Kohn, because he entered upon the oper-

ating room, brought himself within the doctrine, and became the agent of Dr. Lipschutz.

But I believe that Pennsylvania would countenance another basis of liability for Dr. Lipschutz, that of vicarious liability for his agent Dr. Chodoff, whose sub-agent Kohn was negligent, all in the scope of their respective employments. See Rockwell cases, supra.

As I see it, there is enough here to permit the question of whether Kohn became the agent of either doctor or both of them, to go to the jury under proper instructions. Benedict v. Bondi, 384 Pa. 574, 122 A.2d 209 (1956); Yorston v. Pennell, 397 Pa. 28, 32, 153 A.2d 255, 85 A.L.R.2d 872 (1959); Rockwell v. Stone, 404 Pa. 561, 173 A.2d 48 (1961). See also Mature v. Angelo, 373 Pa. 593, 598, 97 A.2d 59 (1953); Siidekum, Administrator v. Animal Rescue League of Pittsburgh, 353 Pa. 408, 45 A.2d 59 (1946).

The Majority feels that, in light of plaintiff's concessions, Rule 51 F.R.Civ.P. is properly applied, there being no plain error. It seems to me that if there is sufficient evidence to support a proper charge, and that charge was on a fundamental point, error by counsel in the applicable law does not relieve the trial judge of charging the law of the case. If it was fundamental I believe we ought to recognize it on appeal. Counsel can stipulate fact, but ordinarily cannot stipulate or concede law. It is not necessary that the error be plain or obvious, to be cognizable. District Courts make few "obvious" errors, they are invariably arguable. This was arguable but none the less fundamental. It went to the liability itself of a defendant under applicable law. See Callwood v. Callwood, 233 F.2d 784, 788 (3 Cir. 1956); McNello v. John B. Kelly, Inc., 283 F.2d 96 (3 Cir. 1960).

---

5. McConnell, 361 Pa. pp. 362-363, 65 A. 2d pp. 246, 247; Benedict, 384 Pa. pp. 577, 579, 122 A.2d pp. 210, 211; Yorston, 397 Pa. p. 40, 153 A.2d p. 260; Rockwell v. Stone, 404 Pa. p. 568, 173 A.2d p. 51; Rockwell v. Kaplan, 404 Pa. p. 578, 173 A.2d p. 56.

On Petition for Rehearing

Before BIGGS, Chief Judge, and Mc-LAUGHLIN, KALODNER, STALEY, GANEY and SMITH, Circuit Judges.

PER CURIAM.

In our original opinion we held that the release did not absolve Dr. Lipschutz of vicarious liability to the plaintiff Mazer and accordingly reversed the judgment and ordered the case remanded for trial on the issue of Dr. Lipschutz's vicarious liability. Dr. Lipschutz's executrix insists that we should now rule on other issues respecting the release which might arise and be presented on remand. We deem such consideration by this court at this time to be premature. The parties may, of course, present their views respecting the effect of the release to the court below which may rule in respect thereto as the facts and the law may require. Accordingly, rehearing will be denied.